## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Naoise Connolly Ryan,
Emily Chelangat Babu,
Joshua Mwazo Babu,
Catherine Berthet,
Huguette Debets,
Luca Dieci,
Bayihe Demissie,
Sri Hartati,
Zipporah Kuria,
Javier de Luis,
Nadia Milleron,
Michael Stumo,
Chris Moore,
Paul Njoroge,
Yuke Meiske Pelealu,
John Karanja Quindos,
Guy Daud Iskandar Zen S,
    c/o Tracy A. Brammeier
    Clifford Law Offices
    120 North LaSalle Street, 36th Floor
    Chicago, IL 60602

and

Paul G. Cassell,
    S.J. Quinney College of Law
    University of Utah
    332 S. 1400 E., Room 101
    Salt Lake City, UT 84112-0730

                   *Plaintiffs*,

v.

United States Department of Justice,
    950 Pennsylvania Avenue NW
    Washington, DC 20530-0001

                   *Defendant*.

No. 1:23-cv-3815

## COMPLAINT

Plaintiffs allege the following:

### INTRODUCTION

1.      This case is brought on behalf of the families of victims of "the deadliest corporate crime in our nation's history." *United States v. Boeing Co.*, 655 F. Supp. 3d 519, 537 (N.D. Tex. 2023). The families and their pro bono counsel (collectively "the victims' families" or "the families") seek an order requiring the Department of Justice to comply with their requests under the Freedom of Information Act, 5 U.S.C. § 552.

2.      On October 29, 2018, a Boeing 737 Max crashed minutes after launch; this crash of Lion Air Flight 610 killed all 189 people on board. In March 2019, a Boeing 737 Max again crashed minutes after launch; this crash of Ethiopian Airlines Flight 302 killed all 157 people on board. On each flight, the 737 Max "ascended and descended multiple times before crashing." Matt Zapotosky et al., *Federal Investigators Looking Into Boeing 737 Max Following 2 Crashes in Less Than Five Months*, Wash Post. (Mar. 18, 2019), https://perma.cc/X6V2-RTZE.

3.      The two Boeing planes crashed, and their 346 passengers and crew died, because Boeing concealed the need to train pilots to operate the 737 Max's new software—which could cause nosedives even at low altitudes. When the planes began to descend, their desperate pilots were forced to play Tug-of-war against an automatic flight-control system. But the pilots could not win this game; Boeing had hidden the playbook. Because the company deceived regulators about how the software worked, the FAA did not order the necessary training for 737 Max pilots. Neither did other countries' regulators, which followed the FAA's lead.

4.      Soon, DOJ's Criminal Division began investigating the crashes. For six months, Boeing refused to cooperate.

5.      The criminal investigation triggered DOJ's disclosure obligations under the Crime Victims' Rights Act, 18 U.S.C. § 3771 (CVRA). But after losing their loved ones because of deception by Boeing, the victims' families were then deceived by DOJ—which failed to notify the families or solicit their input, and which falsely told their representative that no investigation was underway.

6.      While hiding its investigation from the victims' families, DOJ raced to protect Boeing and its executives. During the last two weeks of the Trump administration, DOJ and Boeing finalized and executed a Deferred Prosecution Agreement that effectively immunized Boeing and its management from criminal liability. Boeing also received a fine at the low end of the applicable Sentencing Guidelines range and was not required to hire an independent monitor to oversee the company's compliance with safety rules. Nor did the DPA address senior management's role in the catastrophic fraud. Instead, DOJ blamed the scheme on two lower-level employees.

7.      When the victims' families invoked their statutory rights in court, DOJ insisted that Boeing's only victim was the FAA. The district court ruled that the families do in fact represent victims and that DOJ had violated their statutory rights by secretly negotiating the DPA. And last week, the Fifth Circuit held that the families have the right to be heard if and when DOJ moves to dismiss the criminal case.

8.      While the families intend to oppose any such motion, they have been denied documents illustrating what DOJ's investigation uncovered, how DOJ negotiated the DPA, and why DOJ chose to immunize Boeing and spare its executives. To find the answers, the families have requested public records under FOIA. Twenty months after the families submitted their

request, however, DOJ has produced no responsive records. And two months after agreeing to expedite processing of the families' request, DOJ offers only the tautology that the families' request is "still pending."

9.      At every stage of this tragedy, the victims' families have been stonewalled. Their loved ones died because Boeing hid safety information from the FAA. The Criminal Division misled the families about the resulting investigation and secretly negotiated a DPA shielding Boeing and its executives from criminal liability. After the courts recognized that the families represent the victims of Boeing's crimes—and with the DPA's clock ticking—DOJ continues to withhold public records illuminating how and why the government let Boeing off the hook.

10.     This is no way to treat families whose loved ones died in avoidable crashes that "would not have occurred" "without Boeing's fraud." *United States v. Boeing Co.*, No. 4:21-CR-5-O, 2022 WL 13829875, at *6 (N.D. Tex. Oct. 21, 2022). Under the Freedom of Information Act, the victims' families are entitled to prompt relief.

## PARTIES

11.     Plaintiff Naoise Connolly Ryan is the wife of Mick Ryan, who died in the crash of Ethiopian Airlines Flight 302.

12.     Plaintiffs Emily Chelangat Babu and Joshua Mwazo Babu are the parents of Jared Babu Mwazo, who died in the crash of Ethiopian Airlines Flight 302.

13.     Plaintiff Catherine Berthet is the mother of Camille Geoffroy, who died in the crash of Ethiopian Airlines Flight 302.

14.     Plaintiff Huguette Debets is the partner of Jackson Musoni, who was the father of her two young children and who died in the crash of Ethiopian Airlines Flight 302.

15.     Plaintiff Bayihe Demissie is the husband of Elsabet Minwuyelet Wubete, who died in the crash of Ethiopian Airlines Flight 302.

16.     Plaintiff Luca Dieci is the brother of Paolo Dieci, who died in the crash of Ethiopian Airlines Flight 302.

17.     Plaintiff Sri Hartati is the wife of Eryanto Hartati, who died in the crash of Lion Air Flight JT610.

18.     Plaintiff Zipporah Muthoni Kuria is the daughter of Joseph Kuria Waithaka, who died in the crash of Ethiopian Airlines Flight 302.

19.     Plaintiff Javier de Luis is the brother of Graziella de Luis, who died in the crash of Ethiopian Airlines Flight 302.

20.     Plaintiffs Nadia Milleron and Michael Stumo are the parents of Samya Stumo, who died in the crash of Ethiopian Airlines Flight 302.

21.     Plaintiff Chris Moore is the father of Danielle Moore, who died in the crash of Ethiopian Airlines Flight 302.

22.     Plaintiff Paul Njoroge is the husband of Carolyne Nduta Karanja and father of Ryan Njuguna Njoroge, Kelli W. Pauls, and Rubi W. Pauls. His wife and three children died in the crash of Ethiopian Airlines Flight 302.

23.     Plaintiff Yuke Meiske Pelealu is the wife of Rudolf Petrus Sayers, who died in the crash of Lion Air Flight JT 610.

24.     Plaintiff John Karanja Quindos is the husband of Anne Wangui Karanja, the father of Carolyne Nduta Karanja, and the grandfather of Carolyne's three children. His wife, daughter, and grandchildren died in the crash of Ethiopian Airlines Flight 302.

25.     Plaintiff Guy Daud Iskandar Zen S. is the father of Fiona Zen, who died in the crash of Lion Air Flight JT 610.

26.     Plaintiff Paul G. Cassell is pro bono counsel to the victims' families. He is the Ronald N. Boyce Presidential Professor of Criminal Law and University Distinguished Professor of Law at the S.J. Quinney College of Law at the University of Utah. Professor Cassell is an expert in criminal law and co-authored the nation's only law-school textbook on crime-victims' rights.

27.     Defendant U.S. Department of Justice is an agency under 5 U.S.C. §§ 551(1) and 552(f). DOJ has possession, custody, or control of the public records requested by the victims' families. DOJ's headquarters are located at 950 Pennsylvania Avenue NW, Washington DC 20530-0001.

## JURISDICTION AND VENUE

28.     The Court has federal question jurisdiction (28 U.S.C. § 1331), and personal jurisdiction over DOJ, under 5 U.S.C. §§ 552(a)(4)(B) and (a)(6)(E)(iii).

29.     Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## FACTS

**A.     To minimize pilot-training costs and boost sales of its new 737 Max airplanes, Boeing commits criminal fraud that causes two plane crashes—killing 346 passengers and crew.**

30.     In 2011, Boeing began developing the 737 Max, the company's "competitive answer" to more fuel-efficient jets built by archrival Airbus. *See* Deferred Prosecution Agreement at A-2 ¶ 5, *United States v. Boeing Co.*, No. 4:21-CR-005-O (N.D. Tex. Jan. 7, 2021), ECF No. 4 ("Boeing DPA"). Boeing imposed "tight deadlines and strict budgets" and pressed engineers to submit designs at "double the normal pace." David Gelles et al., *Boeing Was "Go,*

*Go, Go" to Beat Airbus with the 737 Max*, N.Y. Times (Mar. 23, 2019),

http://tinyurl.com/5n8y2xc4.

31.     To match Airbus jets' fuel efficiency, the 737 Max used a larger engine that

changed the plane's aerodynamics. *Id.* at A-7 ¶ 20. These changes also made the plane's nose

more likely to "pitch up." *Id.* at A-7 ¶ 21. If that happened, Boeing's new Maneuvering

Characteristics Augmentation System—known as MCAS—would "automatically cause the

airplane's nose to pitch down." *Id.* at A-7 ¶ 23.

32.     Originally, MCAS could activate only "during a high-speed, wind-up turn." *Id.* Yet

Boeing later expanded MCAS's "operational scope." *Id.* at A-8 ¶ 25. MCAS went from

activating rarely—during "high-speed flight" only—to potentially activating during "nearly the

entire speed range for the 737 MAX." *Id.* The system could pitch down the plane's nose even

during "low-speed flight, which generally occurs at a lower altitude and in and around takeoff

and landing." *Id.*

33.     Boeing knew that the prospect of low-altitude nosedives demanded new training for

pilots. But if the FAA had required this costly new training, Boeing would have needed to

discount each plane by up to $1 million. *See, e.g.*, Niraj Chokshi, *House Report Condemns Boeing

and F.A.A. in 737 Max Disasters*, N.Y. Times (Sept. 16, 2020), http://tinyurl.com/wp83xa85.

34.     As a result, one of Boeing's "stated objectives" was to persuade the FAA's Aircraft

Evaluation Group (AEG) to allow "Level B" differences training: Minimal training reserved for

aircraft that behaved like their predecessors. Boeing DPA at A-6 ¶ 19. To meet this objective,

Boeing did not tell regulators about MCAS's expanded scope. *Id.* at A-8–A-9 ¶¶ 25, 26.

35.     Boeing achieved its goal of minimizing pilot training. The Aircraft Evaluation Group's official report included the desired "'Level B' differences-training determination." *Id.* at A-14 ¶¶ 45, 46. Domestic airlines' training manuals "lacked information about MCAS." *Id.* at A-14 ¶ 46. So did training materials prepared by foreign airlines: Because the FAA's Airline Evaluation Group is considered to be "the world's leading" airline regulator, "foreign entities routinely follow the agency's guidance regarding training level certifications and instructional materials." *Boeing Co.*, 2022 WL 13829875, at *2. At home and abroad, 737 Max pilots did not learn about MCAS or how to respond if it began to pull down a plane by its nose.

36.     Boeing's strategy paid off at first, as the 737 Max became "the fastest-selling plane in the company's history." Avie Schneider, *Boeing 737 Max, Involved in 2 Crashes, Is Fastest-Selling Plane in Company's History*, NPR (Mar. 11, 2019), https://perma.cc/9F3A-MC68. Within the company, however, employees worried more and more about whether Boeing's planes were safe. *See, e.g.*, Natalie Kitroeff & David Gelles, *Claims of Shoddy Production Draw Scrutiny to a Second Boeing Jet*, N.Y. Times (Apr. 20, 2019), http://tinyurl.com/3zj8hsud.

37.     In a summer 2018 email to the 737 program's general manager, a veteran 737 Max engineer summarized his safety fears. "Right now all my internal warning bells are going off. And for the first time in my life, I'm sorry to say that I'm hesitant about putting my family on a Boeing airplane." *Boeing Co. Derivative Litig.*, 2021 WL 4059934, at *11 (quotation marks and alterations omitted).

**B.     MCAS causes two Boeing 737 Max planes to crash, killing 346 people.**

   *1.     A Boeing 737 Max crashes in Indonesia with 189 people on board.*

38.     On October 29, 2018, Lion Air Flight 610 took off from Jakarta, Indonesia. After a faulty sensor reported that the plane was pointing up, MCAS "pointed the nose down when it

should not have." David Schaper, *Investigators Find More Evidence of Connections Between Crashes of Boeing 737 Max Jets*, NPR (Mar. 18, 2019), https://perma.cc/W82Y-864M. Pilots tried to manually reverse the nosedive—but MCAS "kept repeating the action." *Id.*

39.     If Flight 610's pilots had been trained to manage MCAS, they could have overridden the software by "activating a series of stabilizer trim cutout switches." *Boeing Co.*, 2022 WL 13829875, at *7. Lacking that training, the pilots "scrambled through a handbook to understand why the jet was lurching downwards." Cindy Silviana et al., *Lion Air Pilots Scoured Handbook in Minutes Before Crash—Sources*, Reuters (Mar. 20, 2019), http://tinyurl.com/ycku2eah.

40.     Thirteen minutes after takeoff, the 737 Max crashed into the Java Sea. All 189 passengers and crew were killed.

> 2.     *After the first crash, Boeing's CEO approves false statements about the safety of the 737 Max.*

41.     As post-crash news reports examined whether the 737 Max was safe, Chairman and CEO Dennis Muilenburg complained that Boeing had become defensive and needed "to start playing some offense." *Boeing Co.*, No. 3-21140, S.E.C. Release No. 33-11105, 2022 WL 4445459, at *7 (Sept. 22, 2022) (quotation marks omitted). In November 2018, he approved a press release claiming that the 737 Max "is as safe as any airplane that has ever flown the skies." *Id.* at *2, *8 (quotation marks omitted).

42.     When Muilenburg approved this statement, he knew that "MCAS posed an ongoing safety issue that required remediation" and that Boeing had started to redesign it. *Id.* at *2; *Dennis A. Muilenburg*, No. 3-21141, S.E.C. Release No. 33-11106, 2022 WL 444560, at *2 (Sept. 22, 2022). Rather than disclose this present danger, Muilenburg directed Boeing's staff to

"remov[e] discussion of the planned MCAS software redesign from the Draft Press Release."
*Boeing Co.*, 2022 WL 4445459, at *7.

> 3.   *A Boeing 737 Max crashes in Ethiopia with 157 people on board.*

43.    On March 10, 2019, Ethiopian Airlines Flight 302 took off from Addis Ababa,
Ethiopia. When the 737 Max was only a few hundred feet above ground, MCAS activated. Jeff
Wise, *6 Minutes of Terror: What Passengers and Crew Experienced Aboard Ethiopian Airlines Flight
302*, N.Y. Mag. (Apr. 9, 2019), https://perma.cc/K7Q8-9U5A. The pilots pulled back on their
control yokes, driving the nose back up; but MCAS activated again, dropping the nose even
further. *Id.*

44.    The pilots tried and failed to regain control of the plane. Six minutes after takeoff,
MCAS activated one last time and crashed the 737 Max into a field. *Id.* All 157 passengers and
crew were killed. *Id.*

> 4.   *After the second crash, Boeing's CEO makes false statements about the safety of the
>       737 Max.*

45.    Within two days of the second crash, most countries had grounded the 737 Max.
David Gelles, et al., *U.S. Under Pressure to Cease Flights of Troubled Boeing Jet*, N.Y. Times (Mar.
12, 2019), http://tinyurl.com/3e5n2rdn. Meanwhile, Boeing's CEO called President Trump and
expressed "confidence in [its] safety." *Id.* The company assured the public that it had "full
confidence" in their safety and saw no reason "to issue new guidance to operators." *Id.* Ten days
after the United States grounded the aircraft, Boeing continued to work "around the clock to
make thousands more." Gelles, *Boeing Was "Go, Go, Go" to Beat Airbus*, *supra*.

46.    In April 2019, Boeing's Chairman and CEO again touted the safety of the 737 Max.
This time, he told investors and reporters that "there was no surprise or gap or unknown" that

had evaded the "certification process," and that Boeing had "gone back and confirmed" that the company "followed exactly the steps in [its] design and certification processes that consistently produce safe airplanes." *Boeing Co.*, 2022 WL 4445459, at *2.

47.    Again, Boeing's Chairman and CEO knew that these statements were false. He knew, but omitted, that "an internal compliance review had separately identified certain documentation gaps and inconsistencies related to MCAS and the certification process." *Id.*; *Muilenburg*, 2022 WL 4445460, at *2. And he knew, but omitted, that "key facts about MCAS's operation scope had not been disclosed to the FAA's Aircraft Evaluation Group." *Id.*

**C.    DOJ begins a criminal investigation.**

48.    After the second deadly crash, the Fraud Section of DOJ's Criminal Division began investigating Boeing. During the first six months, Boeing refused to cooperate and "frustrated" the investigation. Boeing DPA at 4–5 ¶ 4(c).

49.    Boeing was represented by Kirkland & Ellis, whose former lawyers held several "key positions in the DOJ" at the time. John C. Coffee, Jr., *Nosedive: Boeing and the Corruption of the Deferred Prosecution Agreement* 9 (2022), https://ssrn.com/abstract=4105514. The firm's alumni included the Assistant Attorney General for the Criminal Division (*id.*), who himself had previously been chief of staff to the former DOJ official now leading Boeing's legal defense. *See* Tom Schoenberg et al., *Boeing Has Friends in High Places as it Nears a Showdown Over the 737 Max*, L.A. Times (July 22, 2019), https://perma.cc/FUL3-6GWT.

50.    The victims' families did not know about the criminal investigation or any discussions between DOJ and Boeing's lawyers. Despite the requirements of the CVRA, Justice Department investigators did not contact the victims' families, much less do so at "the earliest

opportunity." Office for Victims of Crime, U.S. Dep't of Justice, *Attorney General Guidelines for Victim and Witness Assistance* 27 ¶ E (2012), https://perma.cc/NVZ9-B6HY.

51.     The families did read news reports that a criminal investigation was underway. *See, e.g.*, Matt Zapotosky et al., *Federal Investigators Looking Into Boeing 737 Max Following 2 Crashes in Less than Five Months*, Wash. Post (Mar. 18, 2019), https://perma.cc/3KYH-GUDL; Steve Miletich, *DOJ Probe Expands Beyond Boeing 737 MAX, Includes 787 Dreamliner*, Seattle Times (June 28, 2019), http://tinyurl.com/5bn5uz6b. As these reports accumulated, the families' representative contacted DOJ and asked, in February 2020, whether the agency had opened a criminal investigation.

52.     The Victims' Rights Ombudsman answered—falsely—that the FBI was neither "investigating the crashes" nor aware of "any open cases at the Justice Department." *Boeing Co.*, 2022 WL 13829875, at *3. She added that if "criminal charges are filed at some point, victims will be advised of that and notified of their rights." *Id.* (quotation marks omitted). The families' representative received a similar—and equally false—response from a "victim specialist" at the FBI Victims' Witness Office. *Id.*

53.     In fact, the criminal investigation continued apace. During the final weeks of the Trump administration, DOJ and Boeing's lawyers negotiated a Deferred Prosecution Agreement "behind closed doors, without conferring with the families." *Boeing Co.*, 655 F. Supp. 3d at 525. The resulting DPA, finalized less than two weeks before President Biden took office, effectively immunized Boeing from criminal prosecution for all conduct related to the two deadly crashes. If Boeing complies with the DPA for three years, the government will move to "dismiss the charge with prejudice." *Id.*

54.    On January 7, 2021, DOJ announced the DPA in a press release. The families

learned about it from social media.

**D.    The Deferred Prosecution Agreement effectively immunizes Boeing and its executives from criminal liability for the deadly 737 Max crashes.**

55.    On the same day, federal prosecutors filed the case in federal court. DOJ bypassed

federal courts in the District of Columbia (home to FAA headquarters), Seattle (where Boeing

designed and built the 737 Max); Chicago (home to Boeing's headquarters, and to the FBI and

DOT field offices investigating Boeing); and Delaware (where Boeing is incorporated). *See*

Coffee, *supra*, at 7–10 (section on DOJ "Forum Shopping"). Instead, the government presented

the DPA to the Fort Worth Division of the U.S. District Court for the Northern District of

Texas.

       *1.    The DPA exaggerates the size of Boeing's financial penalties.*

56.    In lieu of criminal liability, the DPA purported to impose stiff monetary penalties.

DOJ's press release announced that Boeing would "pay over $2.5 Billion." Press Release, U.S.

Dep't of Justice, Off. of Pub. Affs., *Boeing Charged with 737 Max Fraud Conspiracy and Agrees to

Pay Over $2.5 Billion* (Jan. 7, 2021), https://perma.cc/372T-Y4WM. This number, however, was

"greatly inflated." Coffee, *supra*, at 11.

57.    The actual criminal penalty was $243.6 million, a sum at "the low end of the

otherwise-applicable Sentencing Guidelines fine range." Boeing DPA at 7 ¶ 4(j).

58.    For the victims and their beneficiaries, the DPA allocates $500 million. *Id.* at 12

¶ 13. This sum comprises less than $1.45 million for each person killed.

59.    The largest sum, $1.77 billion, is supposed to compensate Boeing's "airline

customers." Boeing DPA at 9–10 ¶ 7; *id.* at 12 ¶ 12. Yet this total was offset by "by any payments

already made" to airlines by Boeing. Coffee, *supra*, at 11, 12. In other words, some or all of this figure was illusory.

> 2. *The DPA does not require an independent compliance monitor.*

60. The DPA not only imposed a modest criminal fine, but it also spared Boeing from oversight by an independent safety monitor. *See* Boeing DPA at 6 ¶ 4(h). DOJ declined to require an independent monitor even though Boeing failed to voluntarily disclose its conduct, refused to cooperate for six months, and has a "prior history" including a 2015 civil settlement with the FAA to address "safety and quality issues" with the company's commercial airplanes. DOJ Press Release, *supra*.

61. In explaining its decision, DOJ claimed that Boeing's misconduct was not "pervasive across the organization," was not "undertaken by a large number of employees," and was not "facilitated by senior management." *Id.* This conclusion was neither explained nor explicable.

> 3. *The DPA blames Boeing's fraudulent scheme on two lower-level employees.*

62. The DPA's Statement of Facts evaded questions about senior management's role in the deadly fraud. In many DPAs, the Statement of Facts is "an incomplete and much negotiated script, with the defendant heavily editing it." Coffee, *supra*, at 2. In Boeing's DPA, the statement "never discusses the role of Boeing's senior (or even its mid-level supervisory) management: What did they know? What did they do?" *Id.* at 17.

63. Instead of addressing management's conduct, DOJ blamed the whole fraudulent scheme on "two of Boeing's 737 MAX Flight Technical Pilots." DOJ Press Release, *supra*. The Statement of Facts singled out Chief Technical Pilot Mark Forkner, who had discovered the

MCAS changes and concealed information from AEG. Boeing DPA at A4–A5, A6, A8, A9–A14, A15 (¶¶ 12–17, 19, 24, 27–42, 44, 50, 51).

64.     Forkner, though, was an unlikely mastermind. His job title notwithstanding, he was neither a test pilot nor an engineer and did not design MCAS; others at Boeing appear to have concealed its scope from him. *See* Coffee, *supra*, at 14, 15. What is more, Forkner was under "pressure from management to ensure" that the 737 Max planes "wouldn't require expensive pilot training," and he "feared losing his job" if the FAA refused "to minimize training." Andy Pasztor & Andrew Tangel, *Ex-Boeing Pilot Complained of Management Pressure on MAX, Former Colleagues Say*, Wall St. J. (Oct. 23, 2019), http://tinyurl.com/ycxp3zak.

65.     DOJ nonetheless chose to prosecute Forkner—and only Forkner—for Boeing's crimes. And at his trial, prosecutors did not explore management's pressure on Forkner "to make sure pilot training was minimized." Dominic Gates, *Why Boeing Pilot Forkner Was Acquitted in the 737 MAX Prosecution*, Seattle Times (Mar. 25, 2022), http://tinyurl.com/42jh6ja2. The jury acquitted him after deliberating for less than two hours. *Id.* Ultimately, "no one was held responsible for the death of 346 passengers." Coffee, *supra*, at 16.

   **E.     The victims' families seek to enforce their rights.**

66.     In late 2021, the families retained pro bono counsel and moved to enforce their rights under the CVRA, 18 U.S.C. § 3771(d)(3). DOJ opposed the motions, arguing that the plane-crash victims were not CVRA victims because Boeing had admitted to defrauding only the FAA.

67.     The district court disagreed, concluding that "but for Boeing's criminal conspiracy to defraud the FAA, 346 people would not have lost their lives in the crashes." *Boeing Co.*, 2022

WL 13829875, at *8. As a result, the Justice Department had violated the families' rights by

negotiating the DPA in secret. *Id.* at *9.

68.    But the court decided that it lacked the authority "to remedy the incalculable harms

that the victims' representatives have suffered." *Boeing Co.*, 655 F. Supp. 3d at 540. A mandamus

petition followed, and last week the Fifth Circuit held that the district court "must uphold crime

victims' statutory rights at every stage of the court's criminal proceedings." *In re Ryan*, ___ F.4th

___, 2023 WL 8664149, at *9 (Dec. 15, 2023). The Fifth Circuit was "confident" that if the

government moves to dismiss Boeing's criminal conspiracy charge, "the district court will assess

the public interest according to caselaw as well as the CVRA" and will consider CVRA

"violations already admitted to, as well as any other circumstances brought to its attention by the

victims' families." *Id.*

69.    If and when DOJ moves to dismiss the criminal charge, the victims' families will

have their day in court. That day may come soon, because the DPA's presumptive three-year

term ends on January 7, 2024.

70.    Although the families are eager to reassert their statutory rights, they have many

unanswered questions: Did DOJ consider evidence that Boeing's management knew about

MCAS's expansion, the need for new pilot training, the false statements to the FAA, or other

safety risks? Why didn't the government hold management accountable for the company's public

statements after the two crashes? How was the criminal investigation impaired when Boeing

initially refused cooperate. Which DOJ officials negotiated or approved the DPA, and did they

have prior ties to Boeing or its counsel? Why did DOJ rush to complete the DPA in January 2021

and file the case in Texas? And why didn't DOJ tell the families about the criminal investigation or solicit their input before negotiating the DPA?

### F.   The victims' families submit a FOIA request and DOJ fails to produce responsive public records.

71.   The criminal proceedings have not answered these questions. Even after recognizing that the families lost their statutory right to confer with DOJ during the DPA negotiations, the district court declined to order the government to produce "evidence and information about Boeing's crimes and the DPA's negotiation history." *Boeing Co.*, 655 F. Supp. 3d at 535–36. Still hoping to get answers, the families have requested public records under the Freedom of Information Act.

#### 1.   *The families submit a FOIA request to DOJ.*

72.   On April 26, 2022, Professor Cassell requested public records from the Freedom of Information Office of the Fraud Section of DOJ's Criminal Division. He did so "on behalf of [his] clients, fifteen family representatives of victims of two Boeing 737 MAX aircraft crashes." Ex. A at 1, 3.

73.   The requested documents included (1) discussions between DOJ and Boeing's lawyers, (2) Boeing's disclosures to the FAA about training pilots to use the MCAS, and (3) DOJ's consideration of and communication with Boeing's victims. *See id.* at 3–8.

74.   The families asked for expedited consideration, because the requested records will help the families "assert their rights under the Crime Victims Rights Act." *Id.* at 7. They also sought a waiver of fees. *See id.* at 8.

> 2.  *Nearly seven months after the FOIA request: DOJ denies expedited treatment and announces more delays.*

75.     By November 15, 2022, DOJ had not produced any responsive records. Still, DOJ extended its deadline by ten more days, on the ground that request presents unidentified "unusual circumstances." Ex. B at 1 (quoting 5 U.S.C. § 552(a)(6)(B)(i)–(iii)).

76.     The government also deferred its decision on the fee-waiver request and denied the families' request for expedited treatment. In lieu of a reasoned explanation for refusing to expedite, DOJ checked a box next to a boilerplate statement that "[y]ou have not established that your request fits within any of the four U.S. Department of Justice standards for expedited treatment." *Id.*

> 3.  *Ten months after the FOIA request: DOJ tells the families that it will take 12 to 18 months to produce the requested public records.*

77.     Ten more days came and ten more days went. DOJ neither produced any public records nor explained why it missed the extended deadline.

78.     More than 90 days later, DOJ finally responded. In a letter dated February 22, 2023, DOJ acknowledged that the request had "been pending for 123 business days." Ex. C. Even so, DOJ would not be producing any public records for another "twelve to eighteen months." *Id.*

79.     Even this estimate was "preliminary" and would "likely be modified as [the] searching is completed." *Id.* Indeed, DOJ warned that the request was "being processed on the complex track"—whose average processing time is "853 days." *Id.*

> 4.  *Sixteen months after the FOIA request: The families renew their request for expedited processing, then appeal the constructive denial of that request.*

80.    On August 25, 2023, Professor Cassell wrote again to the Criminal Division's FOIA office, noting that the families "made the pending records request more than a year ago—on April 26, 2022, but have yet to receive any information." Ex. D at 2 (emphasis omitted). He then renewed the families' request for expedited processing, given (1) the potential loss of substantial due process rights in the criminal matter (*see id.* at 10–11), and (2) exceptional media interest and questions about the government's integrity (*see id.* at 11–12).

81.    The letter requested a response to the renewed request within ten days, as required by 28 C.F.R. § 16.5(e)(4). *See id.* at 13. Nearly three weeks later, DOJ had not responded.

> 5.  *Nearly eighteen months after the FOIA request: DOJ grants expedited processing.*

82.    The families appealed the constructive denial of the request to expedite. Ex. E (9/13/23 appeal). On October 17, 2023, the agency granted their request, on the ground that the records concern a "matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity that affect public confidence." Ex. F at 1 (quoting 28 C.F.R. § 16.5(e)(1)(iv)). The head of DOJ's Administrative Appeals Staff "assured" the families that "this Office has contacted the Criminal Division and has been advised that [the] request is currently being processed." *Id.*

> 6.  *Twenty months after the FOIA request: DOJ has not produced any public records.*

83.    On the same day, Professor Cassell left a voicemail asking how long it would take DOJ to expeditiously process the families' request. Nine days later (on October 26), a DOJ clerk returned his call but was unable to answer his question. The clerk agreed to email her supervisor and that someone would return his call.

19

84.    More than two weeks later, nobody had returned his call. He left another voicemail on November 13. Again, he received no response.

85.    Three days later (on November 16), Professor Cassell called again and spoke to another clerk, who told him that the request was "still pending." He clarified that the request had been granted expedited treatment; the clerk offered to have a supervisor call him. No supervisor has called him.

86.    On November 21, Professor Cassell left one more voicemail. On the same day, a FOIA officer emailed his co-counsel and "apologize[d] for the delay in returning Mr. Cassell's call." As for his question about the expedited timeline, the FOIA officer wrote that DOJ "has already advised Mr. Cassell" that the "search for responsive records is still pending." *Id.*

87.    After nearly twenty months, DOJ has not produced a single public record responsive to the families' request.

\*     \*     \*

88.    On January 26, 2022, the families participated in a Zoom meeting with Attorney General Merrick Garland. And in March 2022, Garland issued new guidelines to "strengthen the federal government's commitments to transparency in government operations and the fair and effective administration of FOIA." Press Release, U.S. Dep't of Justice, Off. of Pub. Affs., *Attorney General Merrick B. Garland Issues New FOIA Guidelines to Favor Disclosure and Transparency* (Mar. 15, 2022), https://perma.cc/6J9B-J964. The Justice Department's success, he stressed, "depends upon the trust of the people we serve. That trust must be earned every day." *Id.*

89.   When their ordeal began, the families did trust the Justice Department and believed in our system's respect for the rule of law. Since 2019, DOJ has betrayed that trust—ignoring the families' interests, stonewalling and misleading them, and thus exacerbating the grief caused by the crashes themselves. At a minimum, the families deserve to learn what happened. FOIA prevents DOJ from continuing to stand in their way.

## CLAIMS FOR RELIEF

90.   The plaintiffs incorporate by reference paragraphs 1–89.

91.   Each count arises under the Freedom of Information Act, 5 U.S.C. § 552. Also as to each count:

a.   DOJ is an agency subject to FOIA. *See id.* §§ 551, 552(f).

b.   The families have also exhausted, or shall be deemed to have exhausted, their administrative remedies for each DOJ violation. *See, e.g.*, *id.* ¶ 552(a)(6)(C).

c.   The families' request complied with all applicable regulations governing requests for records and expedited processing.

d.   The families' request seeks records within DOJ's possession, custody, or control.

**Count 1:**
**Failure to Meet Deadlines for Expedited Processing (5 U.S.C. § 552(a)(6)(E))**

92.   If an agency has granted "expedited processing" under 5 U.S.C. § 552(a)(6)(E), the request must be processed "as soon as practicable." *Id.* § 552(a)(6)(E)(iii).

93.   On October 17, 2023, DOJ granted "expedited processing" to the families' request and stated that "it will be processed as quickly as practicable." Ex. F at 1. Sixty-six days later, DOJ has neither processed the request nor produced responsive records.

94.     By failing to process the expedited request as soon as practicable, DOJ has violated and is violating FOIA, 5 U.S.C. § 552(a)(6)(E)(iii).

## Count 2:
### Improper Withholding of Agency Records (5 U.S.C. § 552(a)(3)(A))

95.     In response to the families' FOIA request, DOJ has not released any responsive records.

96.     DOJ has not identified any reasonably foreseeable basis to conclude that disclosing the requested records would harm an interest protected by an exemption under 5 U.S.C. § 552(b). *See id.* § 552(a)(8)(A)(i)(I).

97.     Nor has DOJ claimed that disclosing the requested records is prohibited by law. *See id.* § 552(a)(8)(A)(i)(II).

98.     By withholding responsive records without legal basis, DOJ has violated and is violating FOIA, 5 U.S.C. § 552(a)(3)(A).

## Count 3:
### Failure to Conduct a Reasonable Search for Records (5 U.S.C. § 552(a)(3))

99.     Nearly twenty months after the families submitted their FOIA request, DOJ has failed to identify, let alone provide, any responsive records.

100.    By failing to conduct a search reasonably calculated to identify all responsive records, DOJ has violated and is violating FOIA, 5 U.S.C. § 552(a)(3).

## Count 4:
### Failure to Meet Statutory Deadlines (5 U.S.C. § 552(a)(6)(A))

101.    Even if a request is not granted expedited treatment, an agency must make the required determination "within 20 days (excepting Saturdays, Sundays, and legal public holidays)" of receiving the request. *Id.* § 552(a)(6)(A)(i).

102.   After receiving the families request, DOJ failed to make a determination within twenty working days.

103.   Under certain "unusual circumstances," an agency may extend the deadline by ten working days, by providing written notice "setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched." *Id.* § 552(a)(6)(B)(i).

104.   When DOJ claimed the ten-day extension, the families' request was already pending for 203 days. Even with ten extra days, DOJ had already missed the statutory deadline by months.

105.   When claiming the ten-day extension, an agency must provide written notice "setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched." *Id.* Although DOJ's boilerplate written notice invoked "unusual circumstances," the notice did not describe those circumstances. The written notice also failed to disclose the expected new deadline.

106.   Even if DOJ had properly claimed the ten-day extension, another 402 days have passed and DOJ still has not provided the required determination.

107.   By failing to meet the original and extended deadlines, DOJ has violated and is violating FOIA, 5 U.S.C. § 552(a)(6)(A).

### Count 5:
### Constructive Denial of Fee Waiver (5 U.S.C. § 552(a)(4)(A))

108.   Agencies must produce documents at no charge, or at reduced charge, "if disclosure of the information is in the public interest because it is likely to contribute significantly

to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

109.    The families requested a fee waiver and meet the statutory requirements for that waiver.

110.    In a form letter dated November 15, 2022, DOJ checked a box stating, "We have not yet made a decision on your request for a fee waiver. We will do so after we determine whether the processing of your request will result in any assessable fees." Ex. B at 1. DOJ has not identified why it needs this information to evaluate whether the families' request meets the criteria specified in 5 U.S.C. § 552(a)(4)(A)(iii).

111.    Even if a waiver of search fees were not otherwise required, an agency may not charge search fees if it has "failed to comply with any time limit" under 5 U.S.C. § 552(a)(6). *Id.* § 552(a)(4)(A)(viii)(I). As described in Count 4, DOJ has failed to comply with the statutory time limit.

112.    Even if a waiver of duplication fees were not otherwise required, an agency may not charge duplication fees if the agency claims the ten-day extension of time and then "fails to comply with the extended time limit." *Id.* § 552(a)(4)(A)(viii)(II). As also described in Count 4, DOJ has failed to comply with the extended time limit.

113.    By failing to grant the requested fee waiver, DOJ has violated and is violating FOIA, 5 U.S.C. § 552(a)(4)(A).

### REQUEST FOR RELIEF

Plaintiffs ask the Court to provide the following relief:

A. Order DOJ to immediately process the families' FOIA request.

B. Order DOJ to conduct searches reasonably calculated to identify all records responsive to

the families' FOIA request.

C. Declare that the families are entitled to the records requested in their FOIA request and that those records are not exempt from disclosure.

D. Enjoin DOJ from withholding responsive records, or portions of responsive records, that FOIA does not specifically exempt from disclosure.

E. Declare that the families are eligible for a waiver of fees, and enjoin DOJ from denying the requested fee waiver.

F. Award reasonable legal costs and fees, as authorized by 5 U.S.C. § 552(a)(4)(E).

G. Grant any other relief that the Court deems to be proper.

Respectfully submitted,

/s/ Gregory M. Lipper
Gregory M. Lipper (Bar No. 494882)
LeGrand Law PLLC
1100 H Street NW, Suite 1220
Washington, DC 20005
(202) 587-5725
glipper@legrandpllc.com

*Counsel for Plaintiffs*